**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

KENNETH PAGLIAROLI,

        Plaintiff,

        v.

NEW JERSEY DEPARTMENT OF
CORRECTIONS, *et al.*,

        Defendants.

Civil Action No. 19-21505 (MAS) (TJB)

**OPINION**

---

**SHIPP, District Judge**

    This matter comes before the Court on Defendants'[1] motion for summary judgment. (ECF No. 109.) Although Plaintiff Kenneth Pagliaroli ("Plaintiff") filed a response to the motion (ECF No. 111), Plaintiff did not file a responsive statement of material facts in dispute.[2] Respondents filed a reply. (ECF No. 113.) For the following reasons, Defendants' motion shall be granted, judgment shall be entered in favor of the moving Defendants as to all of Plaintiff's claims, and

---

[1] Following various motions and screenings, only the following Defendants remain in this matter: Rutgers, its subsidiary University Correctional Health Care, Dr. Nwachukwu, Ms. Jackson, and Lindsay Pettorini. Plaintiff, however, has never properly served Jackson or Pettorini. When this Court refers to "Defendants" in this Opinion, the Court generally refers to the three served moving Defendants, Rutgers, UCHC, and Dr. Nwachukwu.

[2] Plaintiff's response to the motion, although briefly referencing the summary judgment standard, does not actually respond to the motion and the evidence provided by Defendants. Instead, Plaintiff merely argues that his complaint sufficiently stated a claim for relief under the motion to dismiss standard. As that standard does not apply at this stage of the litigation, Plaintiff's brief is largely unresponsive to Defendants' motion and the facts at hand.

Plaintiff shall show cause within thirty days as to why his claims against the unserved Defendants should not be dismissed for failure to serve or failure to prosecute.

I.      **BACKGROUND**

Plaintiff is a convicted state prisoner currently serving a sentence for conspiracy to commit murder. (ECF No. 109-4 at 10.) Plaintiff's current lawsuit centers around treatment he received for his shoulder. (*Id.* at 14.) Plaintiff originally had claims related to other medical issues. During his deposition, however, Plaintiff clarified that his claims in this matter center on the treatment of his shoulder. In addition, Plaintiff indicated that he was not "talking about the other things" and did not contend other alleged mistreatments were "deliberate indifference" in this matter. (*Id.* at 12, 52, 53, 73.) Plaintiff does discuss his kidney disease in relation to receiving certain medications, specifically Motrin, Mobic, and Toradol, in relation to his shoulder treatment. Plaintiff, however, agreed at his deposition that his claims did not arise from the kidney issues other than as a tangential part of his shoulder treatment. (*Id.*)

Plaintiff contends that his shoulder injuries are the result of a rough van ride that occurred while being transported back from court in 2016. (*Id.* at 33.) According to Plaintiff's medical records, he first complained of shoulder pain stemming from this incident to medical staff on or about March 31, 2017. (*See* ECF No. 108 at 188, ECF No. 109-2 at 3.) At the time, Plaintiff was prescribed Tylenol #4 with codeine and was recommended for a follow-up X-ray. (*Id.*) On April 3, 2017, Plaintiff received the X-ray, which suggested that Plaintiff did not have an acute shoulder injury, but only mild degenerative changes. (ECF No. 108 at 187.) As Plaintiff continued to complain of shoulder pain, Plaintiff was given a Toradol injection in his shoulder on Dr. Nwachukwu's order on May 17, 2017. (ECF No. 108 at 185-86; ECF No. 109-2 at 3.) Plaintiff was also referred for a further consultation. (*Id.*) Plaintiff received a neurology consultation on August 1, 2017. (ECF No. 108 at 182-83.) During this consultation, Plaintiff's left shoulder

appeared "frozen to any sort of passive range of motion," but "no impairment" was found. (*Id.* at 183.) Plaintiff was diagnosed with several spinal issues, including capsulitis and possible tendinitis in his shoulder, and a further Magnetic Resonance Imaging scan ("MRI") and orthopedic consultation was recommended for Plaintiff's shoulder. (*Id.*) During this time, Plaintiff continued to receive Tylenol with codeine for his shoulder pain, albeit the lesser Tylenol #3. (*Id.* at 181.) Tylenol #3 was at least intermittently continued through the spring of 2018. (*Id.* at 74.)

On September 21, 2017, Plaintiff underwent an MRI of his shoulder. (*Id.* at 179-80.) Plaintiff then received an orthopedic consult, at which surgery was recommended to alleviate Plaintiff's shoulder issues. (*Id.* at 178.) Plaintiff underwent that surgery a few weeks later, on October 18, 2017. (*Id.* at 177.) Plaintiff thereafter received a follow-up consultation with the surgeon on November 16, 2017, which indicated that Plaintiff's range of motion had improved, and physical therapy was recommended. (*Id.* at 176.) In late December of 2017, Plaintiff saw a nurse practitioner who noted that Plaintiff had undergone physical therapy, and that Plaintiff at that time reported "no pain" and an improved range of motion. (*Id.* at 174-75.) Plaintiff was instructed to continue stretching his shoulder and to return if his pain reoccurred. (*Id.*) Plaintiff did not complain of shoulder pain during visits for other medical issues between late December 2017 and early May 2018. (*Id.* at 19-173.)

On May 8, 2018, Plaintiff returned with reports of renewed shoulder pain. (*Id.* at 15-17.) Plaintiff was referred for a further consultation. (*Id.*) Plaintiff returned to medical on May 10, 2018, and was given Tylenol for pain while awaiting his orthopedic consult. (*Id.* at 14.) On May 31, 2018, Plaintiff was X-rayed and received his consultation, at which point some degeneration was noted in the shoulder. (*Id.* at 3-4.) Plaintiff's surgeon diagnosed him with impingement syndrome, and recommended a steroid injection and physical therapy, with a follow-up and MRI if nothing improved in the next month. (*Id.* at 3.) At his follow-up on July 5, 2018, Plaintiff

reported "some improvement" but that he still had shoulder pain. (*Id.* at 2.) This continued pain despite injections ultimately culminated in rotator cuff surgery on December 12, 2018. (*Id.* at 189-90.) According to Plaintiff, since this second surgery, his shoulder issues have "mostly' resolved, and "90 percent of the pain that [he] was having" has ceased. (ECF No. 109-4 at 47-48.)

In his deposition, as in his operative Complaint, Plaintiff asserted that he believes that his treatment was delayed or diminished for non-medical reasons, specifically to cut costs as part of a profit-sharing arrangement with medical providers. (ECF No. 109-4 at 37-38.) Plaintiff admitted that he had never seen or heard anything to suggest such a policy, but only reached this conclusion based on profit-sharing agreements he had seen in other, non-medical industries, and his own beliefs. (*Id.* at 37.) Plaintiff also believed that the cessation or limitation of opioid medications, including Tylenols #3 and #4, which he was told was due to a state policy designed to combat opioid addiction, was actually the result of a cost-cutting policy. Plaintiff, however, provided no evidence of such a policy other than his own conclusions and disbelief in the things he had been told. (*Id.* at 40-45.)

In his response to the Summary Judgment Motion, Plaintiff does not provide any other evidence of a policy or custom, and the record is devoid of any evidence other than Plaintiff's own conclusions and beliefs to support the existence of any policy, practice, or custom which limited his treatment to cut costs. (*See* ECF No. 111.) Indeed, Plaintiff's response contains no statement of material facts not in dispute and provides no evidence in favor of his claims. Instead, Plaintiff's response contains little more than argument that Plaintiff provided enough allegations in his Complaint to state an initial claim for relief. (*Id.*)

Dr. Nwachukwu, in a certification provided alongside the Summary Judgment Motion, certifies that she has a set salary, and receives no pay based on any profit sharing. (*See* ECF No. 109-7 at 1-2.) She further certified that she is "not aware of any policy between UCHC and any

4

medical providers" that permits any form of profit sharing, and that she has never been compensated based on any form of profit sharing. (*Id.*)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure[3] 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine [dispute] for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l*

---

[3] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

*Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> A non[-]moving party has created a genuine [dispute] of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead it must present actual evidence that creates a genuine [dispute] as to a material fact for trial.

*Serodio*, 27 F. Supp. 3d at 550.

Pursuant to Rule 56(e)(2) and Local Civil Rule 56.1, where, as here, the moving party files a proper statement of material facts and the non-moving party fails to file a responsive statement of disputed material facts, this Court is free to consider the moving party's statement of material facts undisputed and therefore admitted for the purposes of resolving the motion for summary judgment. *See, e.g., Ruth v. Sel. Ins. Co.*, No. 15-2616, 2017 WL 592146, at *2-3 (D.N.J. Feb. 14, 2017). Even where the defendants' statement of material facts is deemed admitted and unopposed, a district court is still required to "satisfy itself that summary judgment is proper because there are no genuine disputes of material fact and the [defendants are] entitled to judgment as a matter of law" in order to grant summary judgment. *Id.* at 2 (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)).

### III. DISCUSSION

#### A. Plaintiff's medical claims against the moving defendants

Defendants move for summary judgment on Plaintiff's medical claims. As to Rutgers and UCHC, the Honorable Freda L. Wolfson, U.S.D.J. (ret.), permitted only a single claim to proceed past initial screening—that Defendants reduced or delayed Plaintiff's treatment as a result of a cost-cutting policy. (ECF No. 44 at 9.) As to Dr. Nwachukwu, Plaintiff appears to have both this policy claim and a general claim that Dr. Nwachukwu was deliberately indifferent to his medical needs. As Plaintiff stated in his deposition that he only asserted this deliberate indifference claim

in relation to the treatment of his shoulder, and is not raising this claim in relation to his kidney issues or other medical problems, the Court limits its discussion of the doctor's alleged indifference to the shoulder and related care.

To make out a medical claim under the Eighth Amendment, a plaintiff must generally show that the defendants were deliberately indifferent to his medical needs. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582-84 (3d Cir. 2003). This requires that a plaintiff both show that he suffered from a serious medical need, and that the defendants engaged in acts or omissions which would permit the inference that they knew of and disregarded "an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A medical need is sufficiently serious where it "has been diagnosed as requiring treatment or [is a need that] is so obvious that a lay person would easily recognize the necessity of a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert denied*, 486 U.S. 1006 (1988). As deliberate indifference "requires more than inadequate medical attention or incomplete medical treatment," *see King v. County of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008), a plaintiff who shows only negligence or medical malpractice will fail to make out a claim for relief under § 1983. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). Thus, a prisoner who has received treatment will generally fail to show deliberate indifference by asserting only his disagreement or dissatisfaction with the course of treatment he received. *See Hairston v. Dir. Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden County*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

As a civil rights defendant may not be held vicariously liable for the actions of its employees or subordinates, a claim asserting that a medical contractor such as UCHC and Rutgers violated a plaintiff's rights will require that the plaintiff show that the contractor formally enacted a policy, practice, or custom that was the moving force behind the alleged violation. *See Natale*, 318 F.3d at 583-84; *see also Los Angeles County v. Humphries*, 562 U.S. 29, 35-36 (2010); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Proving such a claim will require that the plaintiff show that the defendant formally enacted or put into place a policy, practice, or custom which gave rise to the violation, or that there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation that the defendant can be said to have been deliberately indifferent to the deficiency. *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Natale*, 318 F.3d at 583-84. A claim against a supervisor likewise will require that a plaintiff show that the defendant either was personally involved in the alleged violation, had knowledge of and acquiesced in his subordinate's misdeeds, or enacted a policy which caused the violation. *Chavarriaga*, 806 F.3d at 222-23.

One manner of showing deliberate indifference in the medical context is to show that the defendant limited or delayed necessary medical treatment for non-medical reasons, such as where a defendant focused solely on cost over and above any consideration of medical necessity. *See, e.g., Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674-75 (3d Cir. 2011) (citing *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)). It is not enough that cost was considered as a factor in determining a course of treatment because prisoners "do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Id.* at 674. Rather, a plaintiff must actually show there was a policy of considering cost above relevant medical factors, that this policy affected the

8

treatment he received, and that this "cost-cutting" policy so seriously affected the course of his treatment that it amounts to deliberate indifference to a serious medical need. *Id.*

In this matter, Plaintiff has failed to produce any evidence of a policy, practice, or custom, enacted by UCHC, Rutgers, or Dr. Nwachukwu, which directed medical staff to curtail or delay treatment for non-medical reasons such as cost, and instead provides only his own conclusions based on experience of cost-saving schemes in completely separate industries. Plaintiff has likewise failed to show any pattern or practice of conduct that could support the conclusion that any such cost-cutting or profit-sharing custom or informal policy existed, as the only evidence before the Court relates to the treatment of Plaintiff's shoulder issues. To the contrary, Defendants have provided the certification of Dr. Nwachukwu, which indicates that no such policy exists and that she has never heard of or benefitted from any such policy. In the absence of any concrete evidence of a policy, practice, or custom other than Plaintiff's own beliefs and bald assertions, and in the face of testimony to the contrary, no reasonable juror could find that Plaintiff has shown that Rutgers, UCHC, or the doctor delayed or curtailed Plaintiff's treatment as a cost-cutting measure, and thus Defendants are entitled to judgment as a matter of law as to Plaintiff's policy claim that Defendants reduced his treatment for non-medical reasons.

Turning to Dr. Nwachukwu, Plaintiff also appears to have a direct claim that, as one of the providers who oversaw his treatment, the doctor was deliberately indifferent to his medical needs in relation to his shoulder. In his deposition, it appears Plaintiff bases this assertion on: (1) his belief that his treatment was drawn out or took too long; (2) the removal from narcotic pain relievers, apparently sometime in early 2018, following a state policy of weaning inmates off such medication; and (3) an instance in which Plaintiff could not receive Toradol injections because of kidney issues, for which it appears Plaintiff has no direct evidence of the doctor's involvement other than the doctor's refusal to see him on a date when other medical staff turned him away for

9

their own reasons. None of these instances—a change in medication due to a state-adopted policy,[4] a change in course due to a secondary medical issue, or Plaintiff's dissatisfaction with the length or course of his treatment—suffice to show the doctor was deliberately indifferent to Plaintiff's needs.

A review of Plaintiff's medical records shows that he first complained of shoulder pain in March 2017, was immediately X-rayed and referred for a consultation, and was provided a Toradol injection for the pain. Plaintiff thereafter received an MRI and an orthopedic consultation when the injection did not resolve his pain. After that consultation, Plaintiff underwent surgery within a month of its recommendation, which, with therapy, appeared to resolve his pain for over six months. When Plaintiff's pain returned, he was given another consultation and a steroid injection. When these, too, did not resolve his shoulder issues, Plaintiff had a further consultation and ultimately received a second shoulder surgery a few months later, which Plaintiff acknowledges essentially resolved the issue and reduced his pain by ninety percent. These records thus indicate that Dr. Nwachukwu and the prison medical staff were not deliberately indifferent to Plaintiff's needs. Rather, they: (1) directly treated his shoulder issues; (2) changed the course of treatment when Plaintiff's pain did not resolve; and (3) provided Plaintiff, in just over a year, with two separate surgeries, one of which resolved his pain for several months, and the other seems to have permanently resolved the issue to the level possible. These facts do not permit the inference that Defendants were deliberately indifferent to Plaintiff's shoulder issues. Instead, the facts indicate that Defendants provided necessary treatment in relatively short order and the treatment ultimately resolved most of Plaintiff's pain. Given the record before this Court, and the lack of any supporting

---

[4] Plaintiff asserts that he does not believe the State of New Jersey had such a policy, but has provided no evidence other than his own disbelief to support that assertion, and has not shown that this change was the result of the cost-cutting policy allegations on which his claims rely.

evidence from Plaintiff, this Court concludes that there is no genuine dispute of fact for trial, and that Defendants have shown that they were not deliberately indifferent to Plaintiff's shoulder pain. Plaintiff's dissatisfaction with the amount, length, or course of treatment he received does not change this conclusion. *See Hairston*, 563 F. App'x at 895; *White*, 897 F.2d at 110. As no reasonable juror could find in Plaintiff's favor, the moving Defendants are entitled to summary judgment as to all of Plaintiff's medical claims against them. Defendants' motion shall therefore be granted, and judgment entered in Defendants' favor.

### B. The unserved and fictitious defendants

In addition to the moving Defendants, Plaintiff raised his claims against two Defendants who have yet to be dismissed from this matter and who Plaintiff has not served despite the lengthy pendency of this matter—Ms. Jackson and Lindsay Pettorini. Pursuant to Rule 4, a plaintiff is required to serve his complaint upon all named defendants within 90 days, and a court may, on motion of a defendant or on its own after notice to the plaintiff, dismiss claims against any unserved defendants. *See Tyler v. Cruz*, No. 15-2951, 2019 WL 1149780, at *8 (D.N.J. Mar. 13, 2019); *see also Manuel v. Atkins*, 545 F. App'x 91, 95 (3d Cir. 2013). Likewise, the Court may dismiss claims against any defendant that a plaintiff fails to timely prosecute, such as where a plaintiff fails to serve a defendant after several years. *See* Fed. R. Civ. P. 41; *see also Rogers v. N.J. Dep't of Corr.*, No. 21-2891, 2022 WL 4533848, at *5-6 (3d Cir. Sept. 28, 2022). As such, Plaintiff is directed to show cause within thirty days why his claims against Defendants Jackson and Pettorini should not be dismissed for either failure to timely effect service or failure to prosecute. Failure by Plaintiff to timely respond to this Court's notice within thirty days of the accompanying order shall result in Plaintiff's claims against the unserved defendants being dismissed. This matter shall be administratively terminated pending Plaintiff's response to this directive.

## IV.   CONCLUSION

In conclusion, the moving Defendants' Motion for Summary Judgment (ECF No. 109) is **GRANTED**. Judgment shall be entered in favor of the moving Defendants on all of Plaintiff's claims. Plaintiff is directed to show cause within thirty days as to why his claims against the unserved Defendants should not be dismissed, and this matter shall be administratively terminated pending Plaintiff's response to this Court's order. An appropriate order follows.

*/s/ Michael A. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE